No. 14-17190
No. 15-15885

**In the United States Court of Appeals
For the Ninth Circuit**
_____

JUDITH M RICH and VINCENT VITALE
*Plaintiffs-Appellants*

v.

BANK OF AMERICA, N.A., BANK OF AMERICA, N.A. AS SUCCESSOR BY
MERGER TO BAC HOME LOANS SERVICING, LP AND and BRYAN CAVE,
LLP
*Defendants/Appellees*

_____

On Appeal from the
United States District Court for the District of Arizona
Hon. Douglas L. Rayes Case No. 2:11-cv-00511

_____

**APPELLANTS' REPLY BRIEF**

Beth Findsen
Law Office of Beth Findsen
7279 Adobe Drive, Suite D-120
Scottsdale, AZ 85255
(480) 584-6664 (telephone
beth@findsenlaw.com
*Attorney for Appellants*

## TABLE OF CONTENTS

I.     **SUMMARY OF REPLY**.................................................................1

II.    **THE AGREEMENT**.................................................................2

    **A. BANA Conflates the FAQ and TPP to Distort the Agreement**...................................................................2

    **B. BANA Uses Piecemeal Quotations to Deceptively Describe the Agreement.** ...................................................3

III.   **ARGUMENT**.........................................................................4

    **A. The Rule 12(B) (6) Dismissal Of Contract Claims Is Reversible**.................................................................4
       1.    Integration...........................................................4
       2.    The TPP Was Not an Option..............................6
       3.    Extrinsic Evidence Appropriate to Show Integration. ...........................................................6
       4.    Conditions Precedent and No Cancellation Power. .................................................................8
       5.    BANA's "No Damage" Argument Misconstrues the Agreement.........................................................10

    **B. Summary Judgment on Promissory Estoppel Unwarranted Given Evidence of Detrimental Reliance and Damages**
    ........................................................................**11**
       **1.** Detrimental Reliance....................................11
       **2.** Expectancy Damages Proper.......................15

**C. Defendants Did Not Meet Their Burden For Summary Judgment On Tort Claims**. ..............................................................17

1. Causation and Damages.............................................17
2. Elements Met...........................................................18
   **a.** Negligent misrepresentation..................................18
   **b.** Fraud ...................................................................21
   **c.** Arizona Consumer Fraud Act...............................22
3. BANA Conceded Collateral Estoppel Precludes BANA from Re-Litigating Whether or Not the TPP Payments Constitute Damages........................................................................25

**D. FDCPA Summary Judgment Should Be Reversed Because BANA Became a Debt Collector When It Became the Servicer After Default**...................................................................................25

**E. Homeowners' Motion for Determination That BANA Waived Its Privilege Should Have Been Granted**................................26

**F. Bryan Cave Should Have Been Disqualified as Counsel for BANA and Itself**. ......................................................27

**G. Offset is Not Available to Bryan Cave or BANA**. ............27

**H. Attorney Fees Based on Improper Legal Premise**........... 28

1. "Unfunded Loan Theory" .................................................28
2. Confidentiality...............................................................31

**IV.    CONCLUSION**.........................................................................32

# TABLE OF AUTHORITIES

*Alimena v. Vericrest Financial, Inc.*,
   964 F.Supp.2d 1200, 1213 (E.D. Cal. 2013) ....................................................... 13

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242,253 (1986) ..................................................................................... 21

*Anderson v Preferred Stock Food Markets*
   854 P. 2d 1194, 1197 (Ariz. App. 1993) .............................................................. 7

*A.R.A. Mfg. Co. v. Pierce*,
   86 Ariz. 136 (1959) ............................................................................................ 11

*Becker v. HAS/Wexford Bancgroup, L.L.C.*,
   7 F.Supp.2d 1243, 1249 (D. Utah 2001) ............................................................ 10

*Benjamin v. BAC Home Loans Servicing, LP*,
   No. 2011-CV-101, 2012 WL 1067999, (S.D. Ga. Mar. 29, 2012) ...................... 14

*City of Phoenix v. Fields*, 201 P.3d 529, 219 Ariz. 568 (2009)(en banc) ................. 10

*City of Tucson v. Koerber*,
   82 Ariz. 347, 313 P.2d 411 (Ariz. 1957) .............................................................. 9

*Collins v D.R. Horton*
   505 F. 3d 874 (9th Cir. 2007) .............................................................................. 25

*Corvello v. Wells Fargo Bank, N.A.*
   729 F.3d 878, 880 (9th Cir. 2013) ............................................................... 5, 6, 14

*Fernandez v. Bank of America, N.A.*,
   No. CV-14-1765, 2015 WL 1456748, at *7 (C.D. Cal. Mar. 30, 2015) .......... 13-14

*Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1180
(C.D. Cal. 1998) aff'd sub nom. 216 F.3d 1082 (9th Cir. 2000) .............................. 31

*Harris v. Bank of America Corp.*,
    2014 WL 1116356 (C.D. Cal. Mar. 17, 2014)....................................5, 14

*Jones v. Cochise County*, 187 P.3d 97 (Ariz. App. 2008). ........................9

*Labrant v. Mortgage Elec. Reg. Sys., Inc.*,
    870 F. Supp. 2d 671, 680 (D. Minn. 2012)...........................................19

*Lininger v. Dine Out Corp.*, 131 Ariz. 160, 163 (Ct. App. 1981) ...........11

*Mahan v. First Nat'l Bank of Ariz.*,
    677 P.2d 301 (Ariz. App. 1984).............................................................21

*McIntosh v. IndyMac Bank, FSB*,
    No. 11-CV-0195, 2012 WL 176316 (D. Ariz. Jan. 23, 2012)...........19

*Munoz v Federal National Mortgage Assn.*
No 13-CV-08126, 2014 WL 3418426 at *3
(D. Ariz. July 14, 2014) ...................................................................12, 22

*Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548, 557 (5th Cir. 2012) ........14

*Powers v Guaranty RV, Inc.*,
    278 P.3d 333, 339-40 (Ariz. App. 2012) .............................................24

*Russo v Bank of America,*
    No. 14-CV-382, 2014 WL 3811116 at *4-5
    (N.D Ill. Aug. 1, 2014)...........................................................................7

*Sedghi v. Patchlink Corp.*
    823 F. Supp. 2d. 298, 306-307 (D.C. Md., 2011)................................16

*Sit-Set, A.G. v. Universal Jet Exchange, Inc.*,
    747 F.2d 921 (4th Cir. 1984).........................................................17, 18

*Taylor v State Farm Mut. Ins. Co.*,
    854 P.2d 1134 (Ariz., 1993)...................................................................8

*Villegas v. Transamerica Fin. Servs., Inc.*,
   708 P.2d 781, 783 (Ariz. App. 1985) ................................................................23

*Weiner v. Romley*, 381 P.2d 581, 583-584 (Ariz. 1963) ..........................................12

*Wigod v Wells Fargo Bank, N.A.*
   673, F. 3d. 547, 564 (7th Cir. 2012) ...........................................................11, 13, 14

## <u>STATUTES</u>

Ariz. Rev. Stat. §33-811(c)........................................................................20

Ariz. Rev. Stat. §12-341.01................................. ...............................................30

## <u>TREATISES</u>

Restatement (Second) of Contracts § 90...................................................... 16

Restatement (Second) of Torts §552, Comment (a) ................................. 19

## <u>OTHER</u>

Black's Law Dictionary (8th ed. 2004) ...................................................... 2

# I.    SUMMARY

The root issue for this Court is the meaning and scope of the agreement between BANA and Homeowners for a loan modification. The meaning of the agreement underlies each sub-issue. BANA's definition differs significantly from Homeowners' definition. The trial court should have submitted the contested facts to a jury.  Also, the trial court reversed on issues of law already decided, decided issues of law incorrectly and then dismissed all of Homeowners' claims on summary judgment. On *de novo* review, this Court should reverse and remand for trial.

Nothing in BANA's <u>Response Brief</u> changes the central facts and law of this case. Put simply, BANA and Bryan Cave misled Homeowners about the existence of a balloon payment. Homeowners relied on that misrepresentation, accepted the TPP as explained in the July 2012 correspondence, and made their three payments. BANA kept their payments, did not apply them to Homeowners' mortgage, and then refused to honor its promise.[1]

BANA distorts the facts of the agreement by plucking out isolated bits of the FAQs and by dodging inconvenient writings.

---

[1]    The two documents that concisely describe these events are <u>Plaintiffs' Interrogatories Answers</u> ER0335 and <u>Homeowner Vitale's Declaration in Opposition to Defendants Motion for Attorney Fees</u>. ER0199.

## II.    THE AGREEMENT

### A. BANA Conflates the FAQ and TPP to Distort the Agreement

It is difficult to take seriously BANA's new assessment of the agreement based upon the FAQs for two reasons.   First, BANA expressly disclaimed that the FAQs were part of the contract before the TPP was accepted.  Second, BANA specifically said there would be no balloon payment.

The FAQ and its answer were:

**Q.    Could I end up with a balloon payment?**

**A.**    Yes. If principal forbearance (see definition below) is required to achieve an affordable monthly mortgage payment. The principal forbearance amount would not be part of the unpaid principal balance on your loan that accrues interest, but you would still be responsible for the balance. That amount would constitute a balloon payment that does not accrue interest and is not  due until you pay off your loan, refinance or sell your home. In addition, if your payment is calculated over a longer term that the maturity date of the  modified loan, there will be additional principal owed at the maturity date (Definition of principal forbearance: A portion of the principal amount you  owe  is  deferred  until  the  loan matures. This deferred amount will not accrue interest and must be repaid when you pay off your loan, refinance, or sell your home).

*Black's Law Dictionary* (8th ed. 2004) defines "Balloon payment" as "[a] final loan payment that is usually much larger than the preceding regular payments and that discharges the principal balance of the loan."

But in response to Homeowners' question about this FAQ, Neumeyer wrote, "This is not a balloon loan. There is no balloon loan payment."

2

**B. BANA Uses Piecemeal Quotations to Deceptively Describe the Agreement.**

On June 21, 2012, BANA sent Homeowners the one-page TPP with the three-page FAQs attached. However, the TPP was incomplete. Material terms such as principal and interest were not included. Other terms were unclear. Homeowners asked questions to clarify the terms[2] and Neumeyer responded on July 9, 2012, and July 10, 2012.[3]

The next day, Neumeyer *reconfirmed* the material terms of the "previously approved" proposed LMA loan in her **July 12, 2012** letter:

> Bank of America has provided you with a Trial Period Plan offer dated June 21, 2012. If you accept and timely make all three trial payments under the plan, then Bank of America will offer you a permanent modification that the investor, Fannie Mae, *has approved*. The permanent modification, if you accept it, would have the effect of curing your default on the Loan, fixing your interest rate at 4.625%, and reducing your monthly payment by $687 a month.

[ER0914; ER0456¶17 (emphasis added)].

And so Homeowners accepted the TPP and preapproved permanent modification by mailing the signed TPP on **July 25, 2012** and by making the three payments for July, August, and September. [ER0343-344; ER0455]. Previously BANA argued that the FAQs were not part of the TPP. Now, BANA states the

---

[2] ER01054-1056.
[3] ER1057-59.

TPP "does make clear that BANA will not forgive any amount of Borrowers' debt." [Resp. Br. 6]. BANA continues: "[i]t states that 'past due amounts' on the Loan will be 'added to the balance of your loan,' which will 'increase the total amount you owe.'" [Resp. Br. 5]. *These above statements appear in the non-contractual FAQ, not the TPP*. [ER1051, 1050]

### III. ARGUMENT RELATED TO CLAIMS

### A. The Rule 12(B) (6) Dismissal of Contract Claim

Because Homeowners pled a viable contract and damages, the dismissal of Homeowners' contract claim for failure to state a claim should be reversed.[4]

### 1. Integration

Arguing that there was no contract, BANA misstates the record: "[t]he parties agree that the TPP Agreement is a contract to offer a permanent loan modification upon successful completion of the trial period." [Resp. Br. at 11]. The parties do not agree. The TPP offer had indefinite terms (i.e. no principal balance, no interest rate). But the missing terms were filled in by the parties' July correspondence. The terms were 1) there was no balloon payment, 2) no new amounts would be added to the principal, 3) the interest rate would be 4.625%,

---

[4] The July 10, 2013 <u>Order</u> preceded the <u>Summary Judgment Order</u> by more than a year. ER0158.

4

and 4) the unpaid principal was $195,668.18. The July 2012 correspondence created an integrated agreement with specific terms.

The following timeline illustrates this process of integration:

(1)     The one-page TPP sent to Homeowners on June 21, 2012;

(2)     The three-page FAQs attached to the TPP;

(3)     Homeowners' list of questions to BANA;

(4)     Neumeyer's Responses on behalf of BANA, dated July 9, 2012, and July 10, 2012;[5]

(5)     Neumeyer's July 12, 2012 letter;

(6)     Homeowners' July 16, 2012 inquiry;

(7)     Homeowners' acceptance via submission of the signed TPP and payments for July, August and September 2012.    [ER0343-344; ER0455]

Ducking this evidence, BANA claims that the TPP was intended to be an offer to make a permanent loan modification *of some kind* in the future, *if* all of the bank's terms were met. BANA says it supplied supplemental information to Homeowners gratuitously, implying that Homeowners were neither entitled to ask for clarifying information nor entitled to rely on any information actually given. *But see Corvello v. Wells Fargo Bank, N.A.* 729 F.3d 878, 880 (9th Cir. 2013). *See also Harris v. Bank of America Corp*., 2014 WL 1116356, at *5 (C.D. Cal.

---

[5] ER1057-59.

Mar. 17, 2014) (paying the three TPP payments created a contract for permanent modification).

*Corvello* determined that the TPP was a contract for a permanent modification even when there were no set terms. 729 F.3d at 880. Here, Homeowners' contract terms were specific, preapproved, and agreed to. Moreover, BANA did not apply Homeowners' TPP payments to their mortgage, unlike other TPP cases.

BANA's insistence that there was no mutual assent to "principal forgiveness" is refuted by its own writings and is belied by its claim of unilateral mistake. [ER455-457; ER1054-1062].

### 2. **The TPP Was Not an Option.**

BANA's new argument that the TPP Agreement, as constricted by BANA, was an "option" to be strictly construed against the Homeowners must be disregarded because it was not made until appeal. [Resp. Br. 16]. Despite hundreds of cases characterizing TPP's, Homeowners could unearth no case construing the TPP this way. But even if the TPP were considered an option, Homeowners met all conditions precedent. [ER1060].

### 3. **Extrinsic Evidence is Appropriate to Show Integration**

Further, BANA rattles off general principles restricting parol evidence to promote its interpretation. BANA argues that the material terms of the allegedly

pre-approved permanent modification were inconsistent with the "TPP Agreement" and should not be considered. But again BANA draws false conclusions from the fallacy that the "TPP Agreement", as reinvented by BANA, and not the actual agreement as represented by BANA in July 2012, is the real agreement. BANA promotes its revisionist "TPP Agreement" by attributing FAQ quotes to the TPP. For example, BANA quotes a FAQ that generally warns that differences between regular payments and trial payments may be added to the balance "along with any other past due amounts as permitted by your loan documents," which will "increase the total amount that you owe." But BANA inaccurately attributed the quote to the TPP. [Resp. Br. 14]. What is more, this very FAQ prompted Homeowners' question about the balloon payment and Neumeyer's response: "there will be no amount added to the loan each month." [ER1057]. The terms provided by BANA in July 2012 (pre-approved, no balloon payment, specific principal balance and interest rate) were consistent with the TPP. They are just not consistent with BANA's argument.

In Arizona, a question of integration of contract "requires a trial court to receive evidence" including extrinsic evidence of negotiations, prior understandings, and subsequent conduct. *Anderson v. Preferred Stock Food Market*, 854 P.2d 1194, 1197 (Ariz. App. 1993)(reversing summary judgment). *See also Russo v. Bank of America*, No. 14-CV-32, 2014 WL 3811116 * 4-5 (N.D.

Ill. Aug 1, 2014) (TPP was facially incomplete and relevant extrinsic evidence could be considered). Extrinsic evidence is also proper to help the court interpret a contract. *Taylor v. State Farm Mut. Auto Ins. Co*. 854 P.2d 1134, 1138 (1993). Thus, a proper interpretation of the agreement requires a look at the July 2012 correspondence that prompted Homeowners' acceptance of the pre-approved modification on specific terms. BANA cannot demand blind adoption of its version.

4. **Conditions Precedent and No Cancellation**

Next, BANA extracts a clause from the standard modification application (RMA)[6] to claim the RMA gave BANA a nuclear button to cancel all agreements with Homeowners if BANA determines Homeowners' default was "intentional".[7] BANA glosses over the fact that BANA induced the initial default in 2010. BANA knew this from the beginning and certainly no later than March 2011 when Homeowners filed suit. From March 2011 when Homeowners filed suit through September 2013 when BANA offered the non-conforming TPP, BANA knew

_____

[6] The intentional default language appears in the December 20, 2010 and August 23, 2011 loan applications (RMA's), not the TPP. [ER0919].

[7] All defaults are intentional whether it is because the debtor has large medical bills, lost his job or because the secured property is "underwater". Because HAMP and other TPP programs require a documented hardship, *only intentionally defaulting homeowners* would be eligible to apply or qualify for a HAMP modification. Under BANA's theory, a servicer can cancel any agreement at will at any time because *all defaults are intentional*. This policy not only renders the provision illusory, it also opens the possibly that it can be enforced capriciously.

8

about the circumstances of the default and did nothing. It made a conscious decision to proceed and thereby earn an incentive fee.

Also, BANA never missed a chance to emphasize Homeowners' "intentional" default to the court. Yet BANA did not use or plead this special power.

Even if true that the RMA deputized BANA with the power to cancel later agreements (drafted by BANA) if BANA discovered "intentional default," BANA waived it. "Waiver by conduct" is shown by "acts inconsistent with an intent to assert the right." *Jones v. Cochise County*, 187 P.3d 97 (Ariz. App. 2008). *City of Tucson v. Koerber*, 313 P.2d 411 (Ariz. 1957). For instance, BANA accepted Homeowners December 20, 2010 and August 2012 applications; BANA participated in litigation; BANA sent Homeowners the June 2012 TPP and FAQ; BANA sent letters in July 2012; BANA offered the September 13, 2012 LMA to Homeowners; and BANA refused to respond to a written interrogatory requesting BANA identify any regulations that prohibited it from keeping its promise to Homeowners. [ER0516, ER0597-98].

BANA also waived this claim by not pleading it as an affirmative defense, by not raising it in its multiple motions to dismiss and by waiting more than two years until summary judgment to mention it (without briefing it). Waiver "should be found" when the defendant "has taken substantial action to litigate the merits of

9

the claim that would not have been necessary had the entity promptly raised the defense." *City of Phoenix v. Fields*, 201 P.3d 529, 219 Ariz. 568 (2009)(en banc). This requirement applies even where a party pleaded an affirmative defense, unlike BANA. *Id.* Here, BANA did not plead the affirmative defenses of mistake, fraud, or fraud in the inducement or unilateral mistake.[8] Nor did BANA argue this in its FRCP 12(b)(6) motions.[9]

### 5. BANA's "No Damage" Argument Misconstrues the Agreement

BANA's argument that there is "no damage" to Homeowners only makes sense if one adopts BANA's faulty description of the TPP. For breach of a contract to loan money, courts have held:

> [t]he normal measure of damages for breach of a contract to loan money is the difference, if any, between the interest rate contemplated in the contract between the parties, and the rate the borrower obtained in the alternate loan; plus the expenses of obtaining the second loan. But where the borrower is unable to obtain money elsewhere, and the defendant knew of the particular purpose for which the money was needed, special damages may be recovered, provided they are not speculative or remote.

*Becker v. HAS/Wexford Bancgroup, L.L.C.*, 7 F.Supp.2d 1243, 1249 (D. Utah 2001). Homeowners submitted the <u>Expert Report</u> and <u>Supplemental Report of</u>

---

[8]     ER0774-75; ER0459; (Doc 383, p. 20).
[9]     ER0774-75; ER0459; (Doc 383, p. 20).

10

<u>Ronald E. Greisen</u>, CPA/ABV/CFF, demonstrating exact damages and how they were calculated. [ER0570-0594].

Certainty in damages is not required, even at trial. *Id.* BANA's own authority admits as much. *A.R.A. Mfg. Co. v. Pierce*, 86 Ariz. 136 (1959)(stating that computation of compensatory contract damages is "hardly an exact science" and "not free from difficulty.") However, if there is "some reasonable method of computing [the] net loss," reasonable certainty is shown, even for the notoriously speculative "lost profits" type of damage. *Lininger v. Dine Out Corp.*, 131 Ariz. 160, 163 (Ct. App. 1981).

**B.   Summary Judgment on Promissory Estoppel Unwarranted.**

   1.   **Detrimental Reliance**

To adopt BANA's characterization of the agreement, one must believe that all of those words in the July 2012 correspondence meant nothing. BANA only admits that it committed to provide a permanent modification on hidden terms, different than represented, to be revealed after BANA's receipt of three TPP payments.[10] But disruptively, the parties' written communications and testimony clamor against this fantasy. BANA said that the prospective loan modification

---

[10] A variant of this argument was rejected by the *Wigod* court as an illusory promise. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 563 (7th Cir. 2012) (refusing to read TPP language as an indicator that Wells Fargo could unilaterally refuse the permanent modification with unbridled discretion after the TPP was signed).

allowed for principal reduction.[11]   And BANA went for three years without a whisper of Fannie Mae Guidelines, but now says they form an insurmountable barrier to the agreement BANA made. Indeed, in May 2013 when asked about what regulations prohibited the loan, BANA refused to respond.[12]

BANA initially told Homeowners they "had to be late on their payments in order to be eligible." Homeowners relied on BANA's statements that HAMP and the TPP was their best available option "when in fact other programs would have helped." *Munoz v. Fed. Nat. Mortgage Ass'n*, No. CV-13-01826-PHX-GMS, 2014 WL 3418426, at *3 (D. Ariz. July 14, 2014)(allowing promissory estoppel claim for servicer misrepresentations related to loan modification).

BANA contends that Homeowners did not detrimentally rely on BANA's false promises because Homeowners did not specify each program for which they lost eligibility,[13] citing a case where a lienholder sought to attach a wife's separate property for a judgment against her husband. *Weiner v. Romley*, 381 P.2d 581, 583-584 (Ariz. 1963).   Homeowners' position was neither "speculative" nor "identical to" the feckless *Weiner* creditor, as BANA charges.[14]   The *Weiner* lienholder had no right to attach the wife's property in the first place and lost nothing by losing the imaginary right.   Homeowners had the unrefuted right to

---

[11] ER 0778.
[12] ER ER0597; ER0344; ER0523; ER0211-212; ER0459; ER0516.
[13] Homeowners described concrete lost opportunities.  ER0307;ER0388:15-22.
[14] Resp. Brief 22.

pursue other programs to refinance or save their home but changed their position based on BANA's promises.

BANA fails to distinguish the many cases finding detrimental reliance and damages where the TPP and HAMP are squarely addressed. The *Alimena* court directly rejected BANA's argument that the Homeowners' four trial payments were not damages because "borrowers are simply paying on debts they already owe." *Alimena v. Vericrest Financial, Inc*., 964 F.Supp.2d 1200, 1213 (E.D. California 2013). The court disagreed and said "to hold that lenders may arbitrarily deny permanent loan modifications" despite "borrowers' good faith compliance with the TPP" would invite "lenders to extract what little money these borrowers have left and then foreclose on their homes." *Id.* The *Alimena* court found no indication that the four payments would have been made absent the bank's enticement and concluded "[t]he existence of a debt does not license a creditor to collect payments that would not otherwise have been made." *Id.* at 1213. *See also Wigod v Wells Fargo Bank, N.A*. 673, F. 3d. 547, 566 (7th Cir.2012). Here, the facts are stronger because BANA gave specific written terms of a pre-approved permanent loan modification with no balloon payment.

Indeed, many courts have decided against BANA on promissory estoppel and detrimental reliance related to the TPP and HAMP. *E.g. Fernandez v. Bank of America, N.A.,* No. CV-14-1765, 2015 WL 1456748, at *7 (C.D. Cal.

Mar. 30, 2015) (detrimental reliance on TPP shown where plaintiff "wasted her time and money trying to get a loan modification . . ."); *Harris v. Bank of America Corp.*, No. 13-CV-01751, 2014 WL 1116356, at *8 (C.D. Cal. Mar. 17, 2014)("refraining from alternative measures to save their home" in reliance on TPP sufficient); *Benjamin v. BAC Home Loans Servicing, LP*, No. 2011-CV-101, 2012 WL 1067999, at *6 (S.D. Ga. Mar. 29, 2012)(finding reliance on TPP for "fact-intensive" promissory estoppel).

For authority, BANA cites an unpublished Fifth Circuit case that conflicts with this Circuit's *Corvello* decision. *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548, 557 (5th Cir. 2012); *Corvello*, 729 F.3d at 880 (9th Cir. 2013). Unlike *Pennington*, Homeowners submitted substantial evidence of BANA's intent.[15] Also here, unlike *Pennington*, there is evidence that neither BANA nor Homeowners intended the three TPP payments to be applied to the loan. Accordingly, they were not so applied.

As is *Wigod*, Homeowners forewent every other opportunity to save their home because they relied on BANA. *Wigod*, 673 F.3d at 566. The *Wigod* court found sufficient reliance for promissory estoppel claim where the homeowner gave up investigating other opportunities to save her home and devoted her resources to the TPP payments rather than selling or "simply defaulting." *Id.*

---

[15] If BANA did not intend to be bound, then its representations were fraudulent.

Misleadingly, BANA cites Homeowner Vitale's deposition testimony where he could not rattle off the *names* or *requirements* of specific loss mitigation program as evidence that Homeowners did not forego other opportunities to save their home by negotiating with BANA. But after Vitale's deposition, Homeowners explained that they would have been eligible for the HARP refinance program[16] if they had not relied on BANA's instructions to miss payments.[17]

Homeowners demonstrated BANA's long history of similar deceitful conduct: inducing multiple homeowners to miss payments in order to apply for HAMP, impermissibly dual-tracking, and ultimately refusing to modify the loans (while keeping the TPP payments and money paid to BANA for processing the loan). Despite this evidence, the trial court imposed an inappropriate evidentiary burden on the non-movant Homeowners to identify specific programs foregone as a result of BANA's inducements to apply for HAMP rather than the lost opportunity to apply for other financing.

### 2. **Expectancy Damages Proper**

BANA conflates the types of actual damages available for promissory estoppel with the elements of the claim. Types of actual damages are: (1) expectancy (benefit of the bargain); (2) reliance; or (3) restitution. The claim of promissory estoppel also has a required *element* of reliance, as discussed in the

---

[16] ER0307.
[17] ER0388:15-22.

section above. But that does not mean that a party cannot seek expectancy *damages* for promissory estoppel. A party can seek the damages that most closely approach restoring wholeness.

In *Sedghi v. Patchlink Corp*., a Maryland district court applied Arizona law for a nuanced consideration of whether a claim for promissory estoppel was equitable or legal to support a right to jury trial in a breached employment contract case. 823 F.Supp.2d 298, 305-07 (D. Md. 2011). Acknowledging that promissory estoppel "defies easy characterization," the court explored its history in jurisprudence to hold that "it depends" on the remedy sought whether promissory estoppel is legal or equitable. *Id.* at 303. Affirming that Arizona accepts the Restatement (Second) of Contracts §90, the court emphasized that §90(d) provides, "A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate" and noted that "normal remedies would, of course, include expectation or contract damages." *Id.* at 306. While recognizing that "*sometimes* a promissory estoppel entitles a person to out-of-pocket rather than benefit-of-the bargain damages," the court must consider context, the nature of the relief sought by the plaintiff, and what would make the plaintiff whole. *Id.* at 306. The judge concluded on the facts before him that "the benefit of the bargain damages" sought by plaintiff are "the classic form of legal relief." *Id.* at 307. This finding was because the employment plaintiff sought

monetary damages rather than getting his job back. So it is here. Homeowners seek monetary damages for BANA's breach of promise and are entitled to expectancy damages, the "classic form of legal relief" for their claim.

Once more, BANA forces its artificially cramped definition of the promise to conclude that the return of the three trial payments would make Homeowners whole for BANA's breach. The court should reject this construction that omits the specific terms evidenced by the July correspondence.

## C. DEFENDANTS DID NOT MEET THEIR BURDEN FOR SUMMARY JUDGMENT ON TORT CLAIMS.

### 1. Causation and Damages

BANA relies heavily on a Fourth Circuit case concerning a negotiation between sophisticated parties for the purchase of a ten-million dollar Gulf Stream jet aircraft. *Sit-Set, A.G. v. Universal Jet Exchange, Inc*., 747 F.2d 921 (4th Cir. 1984). BANA cites *Sit-Set* as authority that Homeowners should not be entitled to expectancy damages. BANA claims that even if BANA had not made the false statements, Homeowners would have aborted the negotiation and would have lost only their TPP payments. But BANA has *Sit-Set*'s proposition backwards. If anything, *Sit-Set* supports Homeowners' position that the *buyer* on the receiving end of a misrepresentation is entitled to *expectancy* damages. *Sit-Set* was the *seller* of the jet, not the purchaser. *Id.* at 928-29. *Sit-Set* confirms that the buyer would be entitled to expectancy damages, while the seller would be confined to

reliance damages. *Id.* In *Sit-Jet* the jury instructions incorrectly reversed the proper measure warranting a JNOV. *Id.* at 928-29. The appellate court affirmed noting, 1) the jury instructions incorrectly reversed the measure of damages for buyer vs. seller and 2) there was testimony that if the buyer's true offer had been presented to seller, Sit-Set, the seller would have aborted the contract. Proper buyer damages would have been expectancy damages, but reliance damages were what flowed to prevailing seller *Sit-Set* from the purchaser's misrepresentations.

Homeowners are purchasers, not sellers, of a deceptive financial product. Therefore, *Sit-Set* confirms that benefit of the bargain is the correct measure of damage for the harm that flowed from BANA's representations.

But even if BANA had not confused its holding, *Sit-Set* is distinguishable because this case concerns a "consumer[18] and a large national bank, an adhesion contract, and federal regulations proscribe parameters for federal programs administered by BANA for the purpose of "saving people's homes."

    2.    **Elements Met**

        a.    **Negligent misrepresentation**

BANA mischaracterizes the misrepresentations as a promise of future conduct. Rather, BANA misrepresented the concrete terms of a pre-approved permanent loan modification. In BANA's cited authority, there were no definitive

---

[18] And as to the ACFA and FDCPA, the contest is between a large national bank and the "least sophisticated consumer."

terms and no pre-approval. *Labrant v. Mortgage Elec. Reg. Sys., Inc*., 870 F. Supp. 2d 671, 680 (D. Minn. 2012). BANA now claims that Fannie Mae regulations prohibited the promised principal reductions for three years before the time of the subject loan modification negotiations in July 2012. If that is true *and* if BANA had not waived this argument by failing to raise it below, then BANA's written representation that Fannie Mae had approved the loan was either negligent or willful because BANA failed to advise Homeowners of the restriction when it offered them the pre-approved loan. [ER0344; ER0523]. This additional fact issue alone should have defeated summary judgment.

For a deceit action, courts have "routinely held" that loan servicers have a duty to borrowers to tell the truth and have not required a duty of care be shown. As Judge Bolton stated in the instant case, a loan servicer has a duty to "[a]t a very minimum" "to disclose correct information." [ER0168 (citing *Mcintosh v. IndyMac Bank, FSB*, No. CV-11-195, 2012 WL 176316, at *3 (D. Ariz. Jan. 23, 2012)]. *See also* Restatement (Second) of Torts §552, Comment (a)(an action for misrepresentation assumes duty of care but an action grounded in deceit requires honesty).

Here, the uncontroverted evidence shows that BANA attorney Neumeyer repeatedly provided false information regarding pre-approval by Fannie Mae, the lack of a balloon payment, and the amount of the unpaid principal balance. She

19

chalked this up to a series of "errors," "oversights," "misforecasting," and "omissions" in her September 25, 2012 Letter [ER0630-633], terms she could not explain in her deposition. Nor could Neumeyer define "balloon payment" as used. [ER0629:15-19; ER0634:5-8; ER0637:18-25; ER0652:12-23].

On April 3, 2014, three days after the close of discovery and nearly two years after the agreement was breached, BANA first argued (via a supplemental interrogatory response) that the loan offered by Neumeyer's emails and writings would have violated Fannie Mae Guidelines. [ER0212]. If true that Fannie Mae Guidelines prohibited principal reduction, then BANA and Bryan Cave should have known and should have told Homeowners in July 2012, before they signed the TPP and made their first payment. This belated defense contradicts the written terms of the TPP and the July 2012 writings, touting the modification as "pre-approved" by Fannie Mae. If anything, it shows that BANA and Bryan Cave had the intent to deceive.

BANA was represented by Bryan Cave throughout this litigation. BANA's dual-tracking of the modification and foreclosure forced Homeowners to obtain a court order to stop the trustee sale or waive important rights.[19] Thereafter, Homeowners had to speak to BANA through Bryan Cave attorneys. But this does not insulate BANA from negligence as Appellees imply. [Resp. Br. 33] BANA,

---

[19] Ariz. Rev. Stat. §33-811(c).

20

the principal, is liable for the negligence of its agent. *Mahan v. First Nat'l Bank of Ariz.*, 677 P.2d 301 (Ariz. Ct. App. 1984).

BANA argues Homeowners were "obliged to establish a prima facie case" to defeat summary judgment. [Resp. Br. 32]. As the movant, BANA must 1) *first* show that an element of Homeowner's prima facie case *is lacking* as a matter of law or 2) show that there is no genuine issue of material fact and BANA is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Either way, Homeowners produced the writings and testimony of Neumeyer and Jaramillo, evidence upon which a rational factfinder could find for Homeowners. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

### b. Fraud

The record is replete with evidence of knowledge of falsity or intent to defraud. First, there were the representations themselves: "the new principal balance (UPB) will be $195,668.19" [ER1057]; "you *have already been approved for a permanent modification*" [ER1058 (emphasis added)]; "there won't be any balloon payment:" and "No," the FAQs weren't part of the contract. [ER1058].

Meanwhile the **May 21, 2012** internal BANA modification analysis, which the Homeowners were not shown before signing the TPP and making the three TPP payments, referred to a secret $83,858 balloon payment. [ER0217; SER012;

ER0523, ¶10].  This contradicts the specific statements made after-the-fact on **July 9, 10, and 12, 2012**.

The LMA is the culmination of BANA's intent to lie. The LMA did not deliver what was expressly promised by the TPP as filled in by the July 2012 writings.  Only two people were involved in the TPP and its conversion to the permanent LMA between June 2012 and September 2012: Jaramillo (ex-employee of BANA) and Neumeyer.[20] Also suggesting cover-up of fraud, there were 46 emails exchanged between Jaramillo and Neumeyer between June and October 2012 concerning Homeowners' application, the TPP, and the resulting LMA [ER0383-386] , but BANA and Bryan Cave has refused to cough them up, even *in camera*.

### c.    Arizona Consumer Fraud Act

In *Munoz v Federal Nat'l Mortg. Assn.* the ACFA was held applicable to loan modifications:

> "[F]or purposes of the CFA: the money in a loan is merchandise, the loan itself is a sale, and an oral inducement to take a loan is an advertisement…Here, Plaintiffs allege multiple occasions in which defendants made oral inducements about refinancing, short sales, *and other loan modification opportunities. All of those events were attempted sales of merchandise in the form of loan money.*"

2014 WL 3418426 at *4-5 (emphasis added).

---

[20] ER0621; ER0695.

In short, Judge Rayes' Summary Judgment Order not only improperly reversed Judge Bolton on the "law of the case,"[21] but it also contradicted the logical extension of the precedential *Villegas*. *Id.* at *5. BANA offers no rational distinction between a loan and a loan modification. The broad purpose of the ACFA "to root out fraud" will be thwarted if a lender violates the ACFA by misleading a consumer about a loan, but does not violate the ACFA by misleading a consumer about the modification of the same loan. This defies logic and policy.

BANA argues it was correct to deny Homeowner's Motion for Summary Judgment for "complicated disputes of material fact," on the ACFA and promissory estoppel claims. [Resp. Br. 35] If true, these issues should have been submitted to a jury, not summarily decided against Homeowners. In effect Judge Rayes *denied* Homeowners' claim based on conflicting facts but *granted* BANA's summary judgment motion on the same conflicting facts.

The ACFA creates a statutory duty that flows from the merchant (BANA) and its agents (Bryan Cave) to consumers.

BANA and Bryan Cave now claim that neither the bank nor the law firm cared what Homeowners did with the information given them. In the next breath, they say their statements were settlement talk, not sales talk. But none of the July

---

[21] ER0147, ER0162:14-16.

correspondence mentioned settlement of the law suit. Moreover, what BANA or Bryan Cave intended is a fact question.

Finally, BANA asserts that their attorney Neumeyer was "without knowledge of any alleged falsity" and that her communications were "not made to procure a benefit for the law firm." [Resp. Br. 39]. But what counsel knew or intended is a fact question unsuitable for summary determination, particularly where 46 emails remain under lock and key, hidden from Homeowners and the Court.

Even if Bryan Cave just transmitted BANA's misrepresentations, Bryan Cave cannot neatly side-step ACFA liability. The ACFA is not limited to the originator but "broadly extends" to those who use the misrepresentation "in connection with the sale of merchandise." *Powers v. Guaranty RV, Inc*., 278 P. 3d 333, 339-340 (Ct. App. 2012). Bryan Cave's attempt to distinguish *Powers* by hiding behind its fiduciary duty to BANA is not persuasive. Bryan Cave's duty to BANA does not obviate the statutory duty flowing from a merchant (BANA) and its agents (Bryan Cave) to a consumer. In other words, Bryan Cave's separate duty to BANA does not mean it can peddle a loan modification Homeowners on false terms, exempt from ACFA liability. At its heart, Appellees are indirectly arguing that lawyers are not subject to the ACFA. There is no reason to exempt the firm from the ACFA where, as here, Bryan Cave states that Neumeyer was

24

"transmitting information" straight from BANA and was not providing legal advice. She was acting as a salesman for a merchant marketing a loan product.

### 3. BANA Conceded That the Collateral Estoppel Doctrine Precludes BANA from Re-Litigating Whether or Not the TPP Payments Constitute Damages.

By not responding to the Homeowners' collateral estoppel argument, BANA has conceded that it is precluded by its unsuccessful results in *Shaw* and *Russo* from re-litigating the TPP/Damages issue.[22]

### D. FDCPA Summary Judgment Should Be Reversed Because BANA Became a Debt Collector When It Became the Servicer After Default.

BANA states that the "undisputed evidence in the district court was that BANA or its merger partners have continuously serviced this loan since inception." [Resp. Br. 41]. This is false. Rather, evidence shows that servicing was transferred to a "non-MERS Member" on August 4, 2011 [*Compare* ER525-534; ER0554; ER0344; (Doc 301, p.2)]. BANA and Fannie Mae are both MERS Members, thus if BANA resumed servicing the loan, as represented by Neumeyer's July 9, 2012 email,[23] then BANA resumed servicing the loan "after default" and is servicing for someone other than the purported original creditor,

---

[22] *Collins v. D.R. Horton* 505 F. 3d 874, 880-881 (9th Cir. 2007).
[23] ER 1055 #17, 1058 #17.

"Preferred Home Mortgage." [24]  Hence, under the FDCPA, BANA is a "debt collector". [ER0147, ER0171-0174][25]

### E.    Homeowners' Motion for Determination That BANA Waived Its Privilege Should Have Been Granted.

On September 23, 2013, during a telephone discovery conference, Homeowners orally moved the court to find BANA waived privilege for its communications with Bryan Cave about the TPP and the LMA. Judge Bolton denied the motion. Nearly a year later, Judge Rayes denied Homeowners' *motion for determination* that BANA waived its privilege, mischaracterizing the motion as a *motion for reconsideration*[26] when it was a *new* motion based on new information. BANA argues Judge Rayes' decision it is not appealable because it was a motion for reconsideration.  It was not.

The new motion was filed ten months after the September 23, 2013 hearing before Judge Bolton and was based on new facts developed after the Bolton hearing. Judge Rayes did not consider 1) new information from Jaramillo's October 30, 2013 deposition, 2) new facts disclosed by BANA and Bryan Cave in

---

[24] ER0544-550; ER0344.

[25] At a March 3, 2014 hearing, even Gregory Iannelli could not identify the Deed of Trust Beneficiary for Judge Bolton. [Transcript, p. 8:lines7-15 (Mar. 3, 2014)]

[26] ER0120-121.

later pleadings,[27] 3) new information disclosed by BANA and Bryan Cave in discovery responses, 4) new information from FRCP 26 disclosures (including more than 2,000 pages of documents),[28] and/or 5) new facts from Neumeyer's June 14, 2014 <u>Declaration</u>.[29] Even if the second motion had been for reconsideration, Judge Rayes abused his discretion by not granting it. The result was manifestly unjust because Appellees cherry-picked evidence while withholding the rest, depriving Homeowners of the opportunity for full cross-examination and presenting a one-sided picture.

## F. Bryan Cave Should Have Been Disqualified as Counsel for BANA and Itself.

Homeowners' Article III standing is uncontested as is Vitale's standing as an attorney with a duty to report misconduct. [Op. Br. 61]

## G. Offset is Not Available to Bryan Cave or BANA.

The tort and equitable claims against the agents (BANA and Bryan Cave) cannot be offset by a contract claim asserted by their putative principal (Fannie Mae). Bryan Cave and BANA have yet to explain how it is proper for each to compete for an offset of the same money pot, not owed to either, without the court's determining there is a conflict that disqualifies Bryan Cave as counsel for

---

[27] ER0207 #31-33; 0209# 37-38; 0210; 0211 #44-45; 0212 #48-49; ER 230-232; ER0319; ER 0365; ER0420; ER0424; ER0452-453; ER 0459; ER 0510; ER0526; ER00555; ER0562; ER605; ER0616.

[28] ER0120-121.

[29] ER0418, lines 1-6.

co-defendant BANA. If Appellees are to be believed, Fannie Mae is the "investor" entitled to receive Homeowners' payments. Neither BANA nor Bryan Cave is entitled to take Fannie Mae's money to pay their debts.

Finally, Appellees still contend that there is no conflict between the testimony of Jaramillo and Neumeyer even though Neumeyer initially blamed the errors on Jaramillo [ER 0461], a particularly onerous charge because Jaramillo has a high school degree and no specialized training while her attorney, Neumeyer, has stellar professional and academic credentials. [ER0679; ER0507] Little wonder that the law firm and/or its client want the 46 emails kept secret.

## H.    Attorney Fees Based on Improper Legal Premise

### 1.    "Unfunded Loan Theory"

The unfunded loan theory is a theory relating to damages resulting from misidentification of Homeowners' creditor and a resulting windfall to BANA: payments for a loan that neither BANA nor its purported predecessors made. Homeowners' "unfunded loan theory" is the same as a "misidentification of creditor theory" pursuant to the FDCPA.

The "misidentification of creditor" was not a new cause of action and did not need to be specifically pled. Instead, Homeowners' claim arose under their existing FDCPA and ACFA claims and was based on information discovered during litigation. The homeowners' theory concerned their *damages* under the

FDCPA and the ACFA. The fact that they might have been able to receive similar damages from a contract claim does not convert their FDCPA and ACFA damage claims to a breach of contract action.

Homeowners' argument is simple. If Preferred Home Mortgage (BANA's predecessor-in-interest) did not fund Homeowners' loan, Preferred Home Mortgage was not Homeowners' "creditor" within the FDCPA. Neither Homeowners nor BANA can determine who funded the mortgage. All that is certain is that there is substantial evidence that Preferred Home Mortgage did *not* fund the mortgage.[30] Whether the builder got paid is not relevant when the evidence shows it was not Preferred Home Mortgage that paid him. Judge Rayes exceeded his authority when he substituted his opinion of the facts to find that no reasonable juror would construe the facts differently or, put another way, that no reasonable juror would believe the <u>Estrada Report</u>. Judge Rayes characterized unsigned but notarized documents as "technical violations" of the underwriting process. [ER0109][31] His conclusion contradicts the <u>Estrada Report</u> without evidentiary support for his negative supposition. The issue is not whether Homeowners were right; the issue is whether there was a conflict between Judge Rayes' decision and the uncontradicted report from which a jury could reasonably disagree.

---

[30] ER 0525-0554; ER 109.
[31] *But see* ER0208; ER0552 #10

Judge Rayes again placed the burden on the wrong party: "Nor do Plaintiffs identify who would be entitled to payment if it were determined that their loan never funded" when that issue was irrelevant and not properly before the court.

Homeowners made a prima facie case that the loan did not fund. The burden thereby shifted to BANA to counter Homeowners' proof. BANA failed. Nonetheless, in lieu of countervailing evidence, the court speculated: "…at no time in the last eight years did Engle or any other entity other than mortgage servicer assert that Plaintiffs owed them money for the home….*Presumably* it would be Engle, the builder, because is some other entity, the loan would be funded just by a different entity." [ER0101 (emphasis added)]. Judge Rayes made Homeowners' case for them. If some other entity funded the loan, Preferred Home Mortgages was not the "lender" nor "creditor" and was not entitled to payment. BANA's collections were a windfall to BANA because the bank received payments on a loan that the neither the bank nor its predecessors actually made. Hence, the court erred by finding that Homeowners were unreasonable and that Homeowners' "unfunded loan claim" arose from a contract within the meaning of Ariz. Rev. Stat. §12-341.01 and therefore Homeowners were liable for a portion of BANA's fees.

### 2. Confidentiality

The court improperly considered BANA's version of communications at the court-ordered settlement conference before the Magistrate. BANA's disclosures not only violated the special confidentiality afforded court-ordered mediation proceedings, but also the Court Order's express terms. Communications between the mediator and parties at the mediation "must be protected," as well as communications "in preparation for and during the course of mediation with a neutral." *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1180 (C.D. Cal. 1998) aff'd sub nom. 216 F.3d 1082 (9th Cir. 2000).

The Settlement Conference Order was more restrictive than Rule 408. It prohibited the use of the Confidential Settlement Statement "for any purpose:"

**THIS DOCUMENT IS CONFIDENTIAL….THIS DOCUMENT WILL BE DESTROYED AT THE CONCLUSION OF THE SETTLEMENT CONFERENCE PROCEEDINGS. NO REFERENCE TO THIS DOCUMENT OR ITS CONTENTS SHALL BE MADE IN ANY MOTION, BRIEFS OR OTHER DOCUMENTS FILED IN THIS CASE. THIS DOCUMENT SHALL NOT BE ADMISSIBLE IN EVIDENCE IN ANY JUDICIAL PROCEEDING.**[32]

It follows logically that if the settlement briefs were not to be discussed in any motion, then discussions of their contents was also prohibited. Otherwise the

---

[32] ER0558

best evidence of what was said (the written record) would not be allowed, however, stale hearsay could be considered in its place. Moreover, the hearsay could include comments made in the settlement discussions by the settlement judge without his consent and contrary to his order and expectations.

## V. CONCLUSION

Each of BANA's arguments fail when the central fallacy of its false portrayal of the agreement is exposed. The record and the evidence support Homeowners' claims that the agreement was for a permanent loan modification, pre-approved by Fannie Mae, containing no balloon payment, with an unpaid principal balance of $195,688.19, and an interest rate of 4.65%. Summary judgment for BANA should be reversed and remanded for trial, along with the other relief requested by the Opening Brief.

RESPECTFULLY SUBMITTED this 20th day of November, 2015.

LAW OFFICE OF BETH K. FINDSEN, PLLC

/s/Beth K. Findsen
Beth K. Findsen
7279 East Adobe Drive Suite D-120
Scottsdale, AZ 85255
*Attorney for Appellants Vitale/Rich*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 20, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Beth K. Findsen

**CERTIFICATE OF COMPLIANCE PURSUANT TO 9ᵀᴴ CIRCUIT RULES
32-1, AND Fed. R. App. P. 21(a)(5)-(7).**

I certify that this brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The word count is <u>6,997 words</u>, including headings and signature, conforming with Fed. R. App. P. 32(a)(7)(b).

<u>/s/Beth K. Findsen</u>
Beth K. Findsen (AZ 023205)
LAW OFFICE OF BETH K. FINDSEN, PLLC
*Attorney for Appellants Judith M. Rich and Vincent Vitale*